IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

LUFKIN DIVISION

| | | |
|---|---|---|
| JAMES LEE HAMILTON, #1027897 | § | |
| VS. | § | CIVIL ACTION NO. 9:08cv125 |
| DAVID SWEETIN, ET AL. | § | |

MEMORANDUM OPINION AND
ORDER OF DISMISSAL

Plaintiff James Lee Hamilton, a prisoner previously confined at the Eastham Unit of the Texas prison system, proceeding *pro se* and *in forma pauperis*, filed the above-styled and numbered civil rights lawsuit. The complaint was transferred to the undersigned with the consent of the parties pursuant to 28 U.S.C. § 636(c).

Facts of the Case

The original complaint was filed on July 2, 2008. The Plaintiff complained that he had been denied a safe environment and adequate medical care. He also complained that he had been denied his rights under the Americans with Disabilities Act ("ADA") and the Rehabilitation Act ("RA"). On February 10, 2009, the Court conducted an evidentiary hearing, in accordance with *Spears v. McCotter*, 766 F.2d 179 (5th Cir. 1985), to consider the Plaintiff's claims. The Plaintiff was given the opportunity to fully explain the factual basis of his claims. Regional Grievance Coordinator Chip Satterwhite, Nurse Thomas Maciel, and Wardens Eddie Baker and Sandra Allen were present during the hearing in the event the Court wanted testimony about information contained in the Plaintiff's records or testimony about prison policies.

1

The Plaintiff sued eleven supervisory officials of the Texas prison system. He sued the following five Eastham Unit supervisory officials: Warden David Sweetin, Chief of Classification Bonnie Cawley, Safe Prisons Coordinator Todd Sharp, Assistant Warden Oliver and Assistant Warden Reescano. The Plaintiff testified that through grievances and I-60s they had been advised about the lack of officers and the dangers of him being assaulted, but they did nothing to protect him or to transfer him to another unit. The Plaintiff sued the following three regional supervisory officials who denied his Step 2 grievances: Assistant Regional Director Kevin Mayfield, Kelli Ward and T. Roddy. He finally sued Director Nathaniel Quarterman, Executive Director Brad Livingston and Board Chairman Oliver Bell. The Plaintiff testified that he was transferred from the Eastham Unit to the Huntsville Unit in mid-August, 2008, which was shortly after he filed this lawsuit.

The Plaintiff's failure to protect claims concern problems he experienced with inmates Oliva and Johnson. On June 9, 2007, he and his cellmate were joking around in the hallway of their housing area. Oliva lived in the next cell. Oliva was offended when the Plaintiff used the term "white boy." Oliva threw water on him and subsequently struck him with a sock containing a padlock in it. Both inmates were placed in prehearing detention. They were charged with fighting and found guilty, although the case against the Plaintiff was eventually overturned.

The Plaintiff filed a claim with prison officials claiming that his life was in danger. The Plaintiff gave the Court permission to review his prison records. The records show that Sgt. Lane conducted a life endangerment study on June 20, 2007. Sgt. Lane noted that the Plaintiff acknowledged that he was joking around and the situation got out of hand. He concluded that there was no evidence that the Plaintiff's life was in danger. The Plaintiff testified that Warden Oliver issued instructions to keep them separated and housed on different pods.

Despite Warden Oliver's instructions, the Plaintiff and Oliva were housed two cells from each other on O-Line. On June 25, 2007, Oliva struck the Plaintiff again. The Plaintiff stated that Oliva was drunk as a result of drinking homemade wine. Oliva became angry when he realized that the Plaintiff was not on commissary restrictions. Oliva struck him with his fists. The Plaintiff talked to Sgt. James, who called Captain Lamb. Instead of being placed in a safe place, he was taken to disciplinary court concerning the incident that occurred on June 9, 2007. The Plaintiff testified that he had not had a disciplinary hearing previously because of his life endangerment complaint. Disciplinary officials were waiting for the results of the study before conducting a hearing. The hearing was conducted on July 3, 2007. He was found guilty. His punishment was thirty days commissary and cell restrictions. It is again noted that the case was eventually overturned.

The Plaintiff testified that he subsequently had other episodes with inmate Oliva. On August 23, 2007, Oliva had an S.S.I. job near the Plaintiff's housing area. Oliva stood by the door to the housing area waiting for the Plaintiff to go to chow. Oliva threatened to assault the Plaintiff once again. Another life endangerment study was conducted. Sgt. Wyatt indicated that he observed the offenders arguing, but he did not hear what they said. He told the Plaintiff to go back to his cell block. The Plaintiff testified that Sgt. Wyatt told him to leave Oliva alone. The life endangerment study noted prior problems between the inmates. It was noted that they were now housed in different locations. There was a finding that there was no evidence to support the Plaintiff's claim that his life was in danger. The Plaintiff testified that his problems with Oliva finally came to an end when Oliva got into trouble for reasons unrelated to him and was confined in closed custody.

The Plaintiff stated that his problems with inmate Johnson were the result of an incident that occurred on October 10, 2007. The Plaintiff was on his way to the pill window when Officer Cooper

told him that he could not get a clipper shave. While at the pill window, Officer Reese instructed him to get a clipper shave, thus he got a clipper shave. Officer Cooper became angry over the situation, and she threatened him. The Plaintiff responded by filing a grievance. The Plaintiff subsequently observed Officer Cooper talking to several members of the Crips, including inmate Johnson. The Plaintiff asserted that Officer Cooper was a member of the Crips. They threatened the Plaintiff. The unit went on a twenty day lockdown before they could carry out their threats. On November 18, 2007, the lockdown was lifted. The Plaintiff was then attacked by inmate Johnson in a dayroom. Inmate Johnson accused the Plaintiff of stealing his book. The Plaintiff testified that he attempted to avoid any problems by turning away from Johnson and walking away, but Johnson struck him from behind. He was knocked out. When he regained consciousness, Johnson repeatedly struck him in the face. Other gang members became involved, and the Plaintiff was able to leave the area and alert staff members about the situation. Johnson was disciplined. He was never housed around Johnson again.

The Plaintiff filed a life endangerment complaint as a result of the incident. Sgt. Wyatt conducted a study. Inmate Johnson stated that the incident began when the Plaintiff touched his book after he asked him not to do so. Johnson stated that the altercation began when the Plaintiff swung at him. He felt that the incident was over and that the Plaintiff had no reason to fear him. A conclusion was made that the Plaintiff's life was not in danger.

The Plaintiff testified next about his medical claims. He complained that he was not treated after the incident with inmate Oliva. He acknowledged that he received a prehearing detention physical, but he added that he did not receive any treatment. He testified that he had a large bruise on his right cheek where he was struck with the lock in the sock. He further testified that a nurse

documented the bruise, but it was not documented until 48 hours after the incident. He was provided Ibuprofen at that time.

Nurse Thomas Maciel testified under oath from the Plaintiff's medical records. He noted that the medical records reveal that the Plaintiff received a prehearing detention physical on June 9, 2007. The entry specified that the Plaintiff did not receive any injuries. The Plaintiff was interviewed by the Psychiatric Department on June 12, 2007. Once again, no injuries were noted, but the Plaintiff told the liaison that he was injured. A follow-up exam documented a hematoma to the outer aspect of the cheek. A Physician's Assistant ordered Ibuprofen 600 mg. twice a day. The Plaintiff was examined again on June 15, 2007, and additional medication was ordered. Nurse Maciel testified that the bruise should have appeared rather quickly after the incident. The normal protocol for the bruise would have been Ibuprofen and possibly an ice pack. The Plaintiff was seen again on July 8, 2007. He complained about pain in his cheek. He was prescribed more Ibuprofen. On August 16, 2007, in response to a sick call, medical personnel examined him and found no signs of swelling or discoloration. X-rays were ordered. The x-rays revealed that the orbits were normal. There was no indication that there had been a fracture. Nurse Maciel testified that if there had been a fracture in June, then it would have shown up on the x-rays taken in August. He finally testified that the purpose of a prehearing detention physical is to determine whether an inmate has any injuries that may be life threatening. Any injury observed should be treated.

The Plaintiff testified that he was also denied medical care after the assault by inmate Johnson. He testified that he received bruises on his chest and back. He was examined by Nurse Ferguson, but he added that she ignored his injuries. The Plaintiff testified that his back still hurts, particularly when he sits too long. The Plaintiff testified that he was confined in prehearing

detention after the incident with inmate Johnson from November 18-29, 2007. He was housed there for that length of time because the life endangerment study was being conducted.

The medical records include an entry dated November 27, 2007. The Plaintiff told medical personnel that he had been beaten up on November 18, 2007. He mentioned pain on the right side of his face and ribs. The nurse specified that she did not see any bruising. The area specifically noted by the Plaintiff was not tender to palpation. No distress was observed. Ibuprofen 600 mg. twice a day was ordered for ten days.

The Plaintiff finally testified about his claims under the Americans with Disabilities Act and the Rehabilitation Act. He stated that he is disabled since he is schizophrenic and manic/depressive. He testified that he was placed in a cell without running water in December, 2006. He told the Psychiatric Department that there was no running water in the cell, and they just thought that he was crazy. He told the Psychiatric Department about his problems with Oliva and Johnson, and they "brushed him off due to his schizophrenia." He noted that Dr. Sanders indicated in November, 2007, that he was a "very mischievous person" who brought problems upon himself. He has been prescribed Fluoxetine and Ziprasidone for mental problems. Nurse Maciel confirmed that he was prescribed the psychological medication for Schizoaffective disorder. The medical records reveal that the Schizoaffective disorder was first observed on December 7, 2005. An entry by Dr. Sanders, dated November 20, 2007, noted that the Plaintiff was receiving mental health treatment and that he should be monitored while in segregation.

## Discussion and Analysis

The Plaintiff's primary complaint was that he was denied a safe environment in which to live. The Eighth Amendment prohibits the infliction of "cruel and unusual punishments" on those

convicted of crimes. *Wilson v. Seiter*, 501 U.S. 294, 296-97 (1991). Inmates are entitled to "reasonable safety." *Helling v. McKinney*, 509 U.S. 25, 33 (1993). The Eighth Amendment affords prisoners protection against injury at the hands of other inmates. *Smith v. Wade*, 461 U.S. 30 (1983); *Johnston v. Lucas*, 786 F.2d 1254, 1259 (5th Cir. 1986). "It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Prison officials may not be held liable based on mere negligence. *Id*. at 835. Instead, the standard to employ is whether prison officials were "deliberately indifferent" to the safety needs of an inmate. *Id.*; *Cantu v. Jones*, 293 F.3d 839, 844 (5th Cir. 2002). "[A] prison official cannot be found liable under the Eighth Amendment . . . unless the official knows of and disregards an excessive risk to inmate health or safety; . . . the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. There is no liability if an official "responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844. Prison administrators act reasonably, for example, if they order an investigation into an inmate's claims about a lack of safety. *Johnson v. Johnson*, 385 F.3d 503, 526 (5th Cir. 2004).

The Plaintiff's Eighth Amendment claims should be dismissed for several reasons. First of all, he failed to show that any of the Defendants knew of an excessive risk to his health or safety and disregarded it. He filed grievances and life endangerment claims, which were investigated. The various investigations led to the conclusion that his life was not in danger. A claim based on the Plaintiff's disagreement with the classification decision that his life was not in danger is insufficient to establish a constitutional violation. *Neals v. Norwood*, 59 F.3d 530, 533 (5th Cir. 1995).

It is noted that the Plaintiff testified that he filed grievances and life endangerment complaints after his encounters with Oliva and Johnson. He failed to allege facts showing that any of the Defendants knew that there was an excessive risk to his health or safety before his encounters with Oliva and Johnson. Indeed, the Plaintiff did not have any reason to suspect that he was at risk of harm before the incident with Oliva on June 9, 2007. Consequently, none of the Defendants had any reason to know that there was an excessive risk to the Plaintiff's health or safety before the encounter on June 9, 2007. The Plaintiff further testified that Warden Oliver issued instructions after the incident to keep the Plaintiff and Oliva separated and housed on different pods. He has not shown that any of the Defendants personally violated those instructions and made it possible for Oliva to have access to him. The Plaintiff likewise failed to show that any of the Defendants had reason to know that there was an excessive risk to his health or safety before the incident with inmate Johnson on November 18, 2007. After the incident, however, the inmates were assigned to different housing areas. The Plaintiff's testimony reveals that officials engaged in acts to resolve his problems with Oliva and Johnson. They were not deliberately indifferent.

It is again noted that the Plaintiff sued only prison administrators. Prison administrators act reasonably when they issue instructions to have an inmate's life endangerment complaints studied. The Plaintiff testified that life endangerment studies were conducted when he complained that his life was in danger. The Plaintiff has not shown that any of the Defendants simply ignored his complaints about his safety.

In suing administrators only, the Plaintiff did not sue anyone who arguably personally violated his civil rights, such as Officer Cooper. The Plaintiff has made an erroneous assumption that the Defendants may be held liable just because their subordinates may have violated his civil

rights. The doctrine of *respondeat superior* does not apply in § 1983 lawsuits. *Monell v. Dept's of Social Servs.*, 436 U.S. 658, 691 (1978). Ordinarily, in order to successfully plead a cause of action in a civil rights case, a plaintiff must ordinarily articulate a set of facts that illustrates the defendants' participation in the alleged wrong. *Jacquez v. Procunier*, 801 F.2d 789, 793 (5th Cir. 1986). None of the Defendants personally participated in any alleged act of misconduct. Under 42 U.S.C. § 1983, supervisory officials are not liable for subordinates' actions on any vicarious liability theory. A supervisor may be held liable if either of the following exists: (1) his personal involvement in the constitutional deprivation, or (2) sufficient causal connection between the supervisor's wrongful conduct and the constitutional violations. *Thompkins v. Belt*, 828 F.2d 298, 303-304 (5th Cir. 1987). Neither condition is satisfied.

The Plaintiff sued a number of individuals because they denied his grievances. Congress requires inmates to exhaust their "administrative remedies as are available . . ." 42 U.S.C. § 1997e(a). A prison system is not required to establish grievance procedures, and inmates do not have a basis for a lawsuit because a prison system has not established grievance procedures or fails to adhere to it. 42 U.S.C. § 1997e(b). The Fifth Circuit has made it clear that inmates do not have a basis for a meritorious civil rights lawsuit just because they are unhappy with the results:

> Geiger does not have a federally protected liberty interest in having these grievances resolved to his satisfaction. As he relies on a legally nonexistent interest, any alleged due process violation arising from the alleged failure to investigate his grievances is indisputably meritless.

*Geiger v. Jowers*, 404 F.3d 371, 374 (5th Cir. 2005). Congress established the exhaustion requirement to give prisons and jails the first opportunity to address complaints by inmates, but inmates do not have a basis for a lawsuit because they are dissatisfied with the results. Suing an

official because he denied the prisoner's grievance does not state a cognizable § 1983 claim. *Jackson v. Cain*, 864 F.2d 1235, 1251 (5th Cir. 1989).

The Plaintiff also complained about the medical care he received. Deliberate indifference to a prisoner's serious medical needs constitutes an Eighth Amendment violation and states a cause of action under 42 U.S.C. § 1983. *Estelle v. Gamble*, 429 U.S. 97, 105-07 (1976); *Jackson v. Cain*, 864 F.2d 1235, 1244 (5th Cir. 1989). The deliberate indifference standard established in *Farmer v. Brennan* likewise applies to medical claims. 511 U.S. at 837.

In *Domino v. Texas Department of Criminal Justice*, the Fifth Circuit discussed the high standard involved in showing deliberate indifference as follows:

> Deliberate indifference is an extremely high standard to meet. It is indisputable that an incorrect diagnosis by medical personnel does not suffice to state a claim for deliberate indifference. *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985). Rather, the plaintiff must show that the officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Id.* Furthermore the decision whether to provide additional treatment "is a classic example of a matter for medical judgment." *Estelle*, 429 U.S. at 107. And, the "failure to alleviate a significant risk that [the official] should have perceived, but did not" is insufficient to show deliberate indifference. *Farmer*, 511 U.S. at 838.

239 F.3d 752, 756 (5th Cir. 2001). An inmate does not have a basis for a medical claim just because he believes that the medical care provided was inadequate. *See Estelle v. Gamble*, 429 U.S. at 107; *Jackson v. Cain*, 864 F.2d at 1244; *Johnson v. Treen*, 759 F.2d at 1238.

In the present case, the Plaintiff testified that he was examined by medical personnel after his encounters with Oliva and Johnson. His stated injuries were noted, although the nurses did not always observe the injuries claimed by him. Ibuprofen was routinely provided. X-rays of his cheek area revealed no fractures. The Plaintiff has not shown that anyone was deliberately indifferent to

his medical needs. More importantly, he failed to allege facts showing that any of the Defendants named in the lawsuit were personally aware of any serious medical need and disregarded it. Again, they may not be held liable for the acts of their subordinates based on a theory of *respondeat superior*. The Plaintiff has not shown that any Defendant was deliberately indifferent to him.

Finally, the Plaintiff alleged that his rights under the Americans with Disabilities Act and Rehabilitation Act were violated. Congress enacted the ADA to establish a "comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). *See also Meyers v. Texas*, 410 F.3d 236, 239 (5th Cir. 2005). The Supreme Court fully explained the purpose of Title II of the ADA as follows:

> Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." § 12132 (2000 ed.). A "'qualified individual with a disability'" is defined as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." § 12131(2). The Act defines "'public entity'" to include "any State or local government" and "any department, agency, ... or other instrumentality of a State," § 12131(1). We have previously held that this term includes state prisons. See *Pennsylvania Dept. of Corrections v. Yeskey,* 524 U.S. 206, 210, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998). Title II authorizes suits by private citizens for money damages against public entities that violate § 12132. See 42 U.S.C. § 12133 (incorporating by reference 29 U.S.C. § 794a).

*United States v. Georgia*, 546 U.S. 151, 153-54 (2006). A State "shall make reasonable accommodation to the known physical or mental limitations of an otherwise qualified handicapped applicant or employee unless the recipient can demonstrate that the accommodation would impose an undue hardship on the operation of its program." *Olmstead v. Zimring*, 527 U.S. 581, 606 n.16 (1999).

A disability is defined as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2)(A). In order to state a claim under Title II of the ADA, the Plaintiff must show that (1) he is a qualified individual, (2) who was excluded from participation in or denied the benefits of services, programs, or activities of a public entity, and (3) that such exclusion, denial of benefits, or discrimination was by reason of his disability. *See Lightbourn v. County of El Paso*, 118 F.3d 421, 428 (5th Cir. 1997); *Cole v. Velasquez*, 67 Fed. Appx. 252 (5th Cir. 2003). In order to state a claim under the Rehabilitation Act, he must show that (1) he was a qualified individual with a disability, (2) the program or facility received federal funding; and (3) he was adversely treated solely as a result of the disability. *Chandler v. City of Dallas*, 2 F.3d 1385, 1390 (5th Cir. 1993). In order to prevail under these statutes, the Plaintiff must show that he was disabled. *See Lighthouse v. County of El Paso*, 118 F.3d at 428.

The Plaintiff asserted that he is disabled since he is schizophrenic and manic/depressive. Such mental conditions were not disabilities for purposes of these statutes. *Greene v. Potter*, 240 Fed. Appx. 657 (5th Cir. 2007) (chronic schizophrenia and depression was not a disability for purposes of the Rehabilitation Act); *Adam v. Dickinson Place Charitable Corp.*, 119 F.3d 1 (5th Cir. 1997) (manic-depressive bipolar disorder is not a disability for purposes of the statutes). Moreover, the Plaintiff has not shown that he was adversely treated solely as a result of a recognized disability. He did not show, for example, that he was placed in a cell without running water due to a disability. Instead, officials thought he had running water, and they thought he was just imagining not having running water due to his schizophrenia. He has not shown that he has a basis for a claim under either the Americans with Disability Act or the Rehabilitation Act.

In conclusion, the Plaintiff's various claims fail to state a claim upon which relief may be granted and are frivolous in that they lack any basis in law and fact. The lawsuit should be dismissed pursuant to 28 U.S.C. § 1915A(b)(1). It is accordingly

**ORDERED** that the complaint is **DISMISSED** with prejudice pursuant to 28 U.S.C. § 1915A(b)(1). It is further

**ORDERED** that all motions not previously ruled on are **DENIED**.

So **ORDERED** and **SIGNED** this **13** day of **February, 2009.**

_____
JUDITH K. GUTHRIE
UNITED STATES MAGISTRATE JUDGE